## CIRCUIT COURT OF CAROLINE COUNTY

Raymond Clinton Ratcliffe, Jr.

v.

Peggy Sue Robinson Ratcliffe

Case No. CH96-142

BY JUDGE WILLIAM H. LEDBETTER, JR.

May 5, 1999

Support and equitable distribution are the disputed issues in this divorce case.

Mr. and Mrs. Ratcliffe were married in 1980. They built a house in Caroline County and lived there during the marriage. Two children were born of the marriage: Ashley, 17, and Jonathan, 15. The parties separated on August 22, 1995, and have lived separate and apart since that date.

Mr. Ratcliffe, 51, works at Union Bank and Trust Company. His annual income is $52,000.00. Mrs. Ratcliffe, 41, is employed at the Rappahannock Regional Jail. Her annual income is $21,400.00.

The marital residence has been sold, and the net proceeds are escrowed pending the outcome of this litigation. In addition, the parties own stocks, CDs, and various other items of personal property.

Mr. Ratcliffe now lives in Ashland. Mrs. Ratcliffe and the children reside in Bowling Green. The children attend Fredericksburg Christian School.

Mr. Ratcliffe commenced this suit on September 27, 1996, seeking a no-fault divorce based on one-year separation. Mrs. Ratcliffe filed an answer and cross-bill.

On May 5, 1997, the court referred all matters in dispute to a commissioner in chancery.

On April 9, 1998, the court entered an agreed *pendente lite* order that awarded joint custody of the children, primary physical custody with the mother; established a visitation schedule; provided that Mr. Ratcliffe would maintain health insurance coverage; and stipulated that the matters covered in the order would not be disputed in this proceeding.

For various reasons, the evidentiary hearing was not conducted by the commissioner until April 30, 1998. Thereafter, he filed a 29-page report. Both parties filed exceptions to portions of the report. Arguments on the exceptions were heard on March 15, 1999, and the case was taken under advisement.

## Divorce

The commissioner recommends that Mr. Ratcliffe be awarded a divorce based on one-year separation pursuant to Virginia Code § 20-91(9). The evidence establishes that the parties have lived separately since August 1995. Thus, Mr. Ratcliffe is entitled to a divorce based on one-year separation.

## Custody and Visitation

As noted above, custody and visitation issues have been resolved by agreement. Therefore, the terms of the agreed order of April 9, 1998, will be incorporated in the final decree.

## Child Support

In 1996, the parties litigated child support in the Caroline Juvenile and Domestic Relations District Court, resulting in a support order on November 18, 1996. That decision was appealed, but the parties agreed to consolidate that case with this one so that the issue of child support could be adjudicated in these divorce proceedings.

Mr. Ratcliffe's monthly gross income is $4,433.00 ($52,000.00 ) 12). Mrs. Ratcliffe's monthly gross income is $1,783.00 ($21,400.00 ) 12). Thus, the parties' combined monthly gross income is $6,116.00.

When the parties separated, Mr. Ratcliffe withdrew funds from a joint account and placed them in a separate account at Hanover Bank in his name.

That account accrued considerable interest. In the juvenile court proceedings, the judge added that interest ($152.00) to Mr. Ratcliffe's monthly gross income figure for purposes of calculating his child support obligation. Similarly, the commissioner added $152.00 to Mr. Ratcliffe's monthly gross income in this case. Mrs. Ratcliffe urges the court to do the same.

However, in view of today's decision on the issue of equitable distribution, that fund is being disbursed as marital property. It follows that $152.00 in interest on that account will no longer be available to Mr. Ratcliffe. In setting an amount of child support to be paid, the court uses present income, not amounts received in the past. Therefore, the evidence regarding the interest received by Mr. Ratcliffe from that account in the past is irrelevant now.

Using the income amounts recited above, the parties' monthly basic child support obligation is $1,205.00, according to the schedule in Virginia Code § 20-108.2.

Mr. Ratcliffe pays $82.70 a month for the children's health care coverage. Mrs. Ratcliffe pays $28.96 a month for the children's dental care coverage.

Therefore, the total monthly child support obligation is $1,316.66.

Mr. Ratcliffe's income requests 71% of the total. Thus, the presumptive amount of his child support obligation is $935.00 (71% of $1,316.66), less the deduction for health care coverage ($82.70), or $852.00.

Mrs. Ratcliffe asks the court to deviate from the child support guidelines in order to require Mr. Ratcliffe to pay a portion of the children's private school costs. Mr. Ratcliffe contends that he should not be obligated to pay those costs, and he cites *Solomond v. Ball*, 22 Va. App. 385 (1996), in support of his position. The commissioner adopted Mrs. Ratcliffe's argument and recommended that Mr. Ratcliffe pay $380.00 a month in excess of the guideline amount for one-half of the children's private school and tutoring expenses.

*Solomond* is inapposite. There, the custodial parent offered no justification for transferring the children from one private school to another more expensive one, except that it was "the preferred institution." In this case, the children have attended Fredericksburg Christian School almost all of their academic careers. They are high school students; in fact, Ashley graduates this year. The parents chose to send the children there many years ago. The children are actively involved in school activities. The school meets the needs of the children. This is not a case in which a custodial parent unilaterally decides to send the children to private school and looks to the noncustodial parent to bear all or part of those costs. Rather, this is a case in which the

noncustodial parent unilaterally seeks to remove the children from the private school in which both parents placed them.

Based on the facts and circumstances of this case, a demonstrated need has been shown for the children to continue to attend the school in which their parents placed them. Further, the court agrees with the commissioner that the evidence establishes the parents' ability to pay. In fact, they have done so for many years, even during periods when their financial circumstances were considerably less favorable than they are now.

Next, Mr. Ratcliffe asks the court to mitigate the child support obligation by requiring Mrs. Ratcliffe to invade two Merrill Lynch accounts that the parties established for the children in 1992. Ashley's account has a present value of $32,000.00; Jonathan's account is worth approximately $28,000.00.

These accounts were created pursuant to the provisions of the Uniform Transfers to Minors Act (Virginia Code § 31-37 *et seq.*). Mrs. Ratcliffe is the designated custodian. Obviously, these funds are the property of the children and are not, as Mr. Ratcliffe suggests, marital property subject to distribution under § 20-107.3.

Even assuming that the court has the authority to direct the custodian to use these funds for private school tuition without the concurrence of the custodian (see, e.g., § 31-50), the court declines to do so. The evidence in this case supports the commissioner's finding that the funds were created by the parties as a means of financing the college education of the children. There is no reason to plunder these funds in order to reduce Mr. Ratcliffe's support obligation.

Finally, Mr. Ratcliffe asks the court to impute income to Mrs. Ratcliffe because she left her job as an Allstate Insurance sales agent to go to work as a payroll clerk at the Rappahannock Regional Jail. Imputation of income is not justified because Mrs. Ratcliffe is not voluntarily underemployed. Her reasons for leaving insurance sales are fully detailed in the record, and they are reasonable and plausible. Further, her current income is substantially the same as it was when she last sold insurance for Allstate.

For these reasons, the court is of the opinion that Mr. Ratcliffe's child support obligation should be $852.00 + $380.00 = $1,232.00 per month, beginning May of 1999.

Further, Mr. Ratcliffe will maintain health insurance coverage, Mrs. Ratcliffe will maintain dental coverage, and Mr. Ratcliffe will maintain his existing life insurance policy for the children under § 20-108.1(d).

*Child Support Arrearage*

The commissioner concludes, and the evidence indisputably supports the conclusion, that Mr. Ratcliffe is in arrears in payment of child support. As of the date of the commissioner's hearing (April 30, 1998), the arrearage was $6,108.00.

Mr. Ratcliffe contends that he is not in arrears because the parties agreed to litigate the issue in this case rather than seek a separate, earlier hearing in the support appeal. The argument is without merit. Simply by agreeing to merge the support appeal with this case, Mrs. Ratcliffe did not agree, explicitly or implicitly, that Mr. Ratcliffe's interim child support payments would be stayed or that they would be whatever he thought they should be. The juvenile court support order remains in effect until this court, in this proceeding, makes its determination of child support. See § 16.1-298.

*Equitable Distribution*

The first step in making an equitable distribution under § 20-107.3 is to identify the property and determine its ownership and value. Second, the court must classify all property as marital, separate, or part marital and part separate ("hybrid"). Then, based upon the equities and rights and interest of each party, and considering the factors enumerated in subsection E of the statute, the court distributes the marital property, and the portion of hybrid property that is marital, in the manner(s) set out in the statute. In making the distribution, the court may divide or transfer jointly owned marital property, the court may grant a monetary award, and the court may direct a percentage of pensions or other deferred compensation plans be paid as the benefits are payable in the future. See Swisher, Diehl & Cottrell, *Virginia Family Law* (2d ed. 1997) § 11-3.

In this case, the parties have identified and valued their property with little controversy. The findings of the commissioner with regard to these matters are fully supported in the record.

The focus of the parties' dispute is the classification of several significant assets which Mr. Ratcliffe claims as separate property. In support of his claim, he cites three events.

First, Mr. Ratcliffe acquired $134,000.00 upon the death of his first wife in 1978. These monies came from life insurance, sale of the marital home, and bank accounts.

Second, in 1985 Mr. Ratcliffe inherited $19,000.00 upon the death of his grandfather.

Third, Mr. Ratcliffe inherited $99,300.00 when his mother died in 1991.

In each case, the funds received by Mr. Ratcliffe constituted separate property under § 20-107.3(A)(1). The flaw in Mr. Ratcliffe's argument is that these separate funds no longer exist. In each case, the funds subsequently were so commingled with marital property, including wage incomes of Mr. Ratcliffe and Mrs. Ratcliffe during the marriage, that they lost their identity and now have been transmuted to marital property. See § 20-107.3(A)(2) and (3).

Transmutation is the change of classification of property by actions which evidence the intent of the parties to change the nature of the property, or by implied intent of the parties by the commingling of separate and marital property. *Virginia Family Law, supra*, § 11-9.

The doctrine of transmutation by commingling was adopted in Virginia in *Smoot v. Smoot*, 233 Va. 435 (1987). In *Smoot*, the Supreme Court also adopted a "unitary theory" of property classification, so that property must either be entirely separate or entirely marital. Later decisions of the Court of Appeals strictly applied *Smoot*, holding that the slightest commingling of marital and separate property would transmute the entire asset to marital property. In 1990, the General Assembly ameliorated the harshness of *Smoot* and its progeny by enacting the so-called "dual classification amendments." Those revisions to § 20-107.3 created a new classification of property, part marital and part separate (i.e., "hybrid"), and set forth the circumstances in which such classification is to be made. Therefore, transmutation by commingling is now governed by statute.

Where marital and separate property are commingled, resulting in the total loss of identity of the contributed separate property so that the source is not retraceable by a preponderance of the evidence, the classification of the contributed property is transmuted to marital property.

As described above, Mr. Ratcliffe acquired approximately a quarter of a million dollars from outside sources prior to and during the course of this marriage — funds that would be classified as his separate property if he had maintained them as such. However, on all occasions, he placed the funds in jointly owned bank accounts that served as repositories for his wage income, Mrs. Ratcliffe's wage income, joint tax refunds, and the like. Eventually, monies from those jointly owned bank accounts were used to purchase jointly owned stocks and other assets. As the commissioner found, contributions to these existing jointly owned assets cannot be retraced to the separate funds that Mr. Ratcliffe inherited from his first wife, his grandfather, or his mother.

Therefore, the commissioner's analysis and findings regarding the classification of the parties' assets are plainly correct and are approved and confirmed.

The commissioner also was correct in his determination that the funds established for the children under the Uniform Transfers to Minors Act are neither marital nor Mr. Ratcliffe's separate property. As discussed above, those funds belong to the children and are not subject to equitable distribution between Mr. and Mrs. Ratcliffe.[1]

Next, the commissioner recommended a scheme of distribution of the marital property, considering all the facts and circumstances and weighing each of the factors enumerated in § 20-107.3(E).

Upon a review of the report and the evidentiary record, the court accepts the commissioner's recommendations except in three respects.

First, the commissioner recommended that each party receive one-half of the other party's IRA. Because the IRAs are not jointly owned assets, the court cannot order their transfer. See § 20-107.3(C). Further, the value of Mr. Ratcliffe's IRA seems to be inadvertently misstated on p. 25 of the report. (See, e.g., p. 14 of the report.) In light of these circumstances and considering all the statutory factors, the court distributes each IRA to the party in whose name it is titled.

Second, the commissioner recommended that Mr. Ratcliffe "receive 40% of [Mr. Ratcliffe's] retirement plan at Union Bank and Trust" and "receive 40% of [Mr. Ratcliffe's] master defined contribution plan." He stated that the marital share of the retirement plan "to the wife" is $6,492.50 "plus all accrued interest on the marital share." He further said that the marital share of the defined contribution plan "to the wife" is $24,140.60 "plus interest on the marital share."

This language appears to be inconsistent with the provisions of § 20-107.3(G). Pursuant to that section, the court may direct payment of a percentage of the marital share of any pension, profit-sharing or deferred compensation plan, or retirement benefits. However, the statute imposes two restrictions. The court can only direct that payment be made *as such benefits are payable*. Further, the court cannot direct payment in excess of 50% of the marital share of the cash benefits actually received by the party against whom the award is made.

---

[1] During arguments before the court on March 15, 1999, Mr. Ratcliffe appears to have conceded that the UTMA funds belong to the children, subject to custodianship. His argument that the funds nonetheless should be used to pay the children's school tuition has been addressed separately under "child support."

In consideration of the foregoing principles and the statutory factors, the court will direct payment to Mrs. Ratcliffe of 40% of the marital share of Mr. Ratcliffe's plans, payable as such benefits are payable. "Marital share" is defined in subsection G of § 20-107.3. Because Mr. Ratcliffe began employment at Union Bank in 1985 and the parties separated in 1995, the numerator in determining the marital share shall be 10.

Third, the commissioner recommended an equal division of the parties' stocks. However, he listed a specific number of shares to each party. Because there may have been splits or increases since the valuation date, the court will direct that all stocks be divided equally between the parties, as the commissioner recommended, but without reference to specific numbers of shares.

Mr. Ratcliffe contends that the commissioner did not give sufficient consideration to the second enumerated factor in subsection E of § 20-107.3. That provision requires the court to consider "the contributions ... of each party in the acquisition and care and maintenance of such marital property of the parties ... ." As the court has already noted, the commissioner did give proper consideration to all of the statutory factors, including (2), in making his recommended scheme of distribution.

Mrs. Ratcliffe complains that the commissioner distributed $10,000.00 to Mr. Ratcliffe from the house sale proceeds for his purchase of the land. Assuming that she is correct that the payment for the land cannot be traced to Mr. Ratcliffe's inheritance from his first wife, the commissioner's finding that Mr. Ratcliffe made the premarital purchase with his funds is not plainly wrong. Further, treating the disparity in distribution as a monetary award, the commissioner's recommendation is fair and will be confirmed.

### Spousal Support

After considering all of the factors listed in § 20-107.1, the commissioner found that Mrs. Ratcliffe is not entitled to spousal support. The court adopts the reasoning and finding of the commissioner on this issue. Despite the disparity in education and earned income of the parties, Mrs. Ratcliffe's age, health, earning capacity, and the liquid character of the assets being distributed to her in this proceeding justify a denial of spousal support.

### Other Matters

The court is of the opinion that each party should bear his or her attorney's fees and that the costs should be assessed equally. The

commissioner's fee is approved and will be paid from the distribution of proceeds of the marital property.

The court is of the opinion that the arrearage in child support should be paid to Mrs. Ratcliffe from Mr. Ratcliffe's share of the house sale proceeds. If the parties cannot agree, any arrearage that has accrued since the date of the commissioner's hearing will have to be determined by a court.

Ms. Sutton will please prepare and circulate a sketch final decree reflecting the decisions contained in this opinion letter and directing that all transfers and payments (except those to be made under § 20-107.3(G) shall be completed within sixty days. All future matters relating to custody, visitation, and support will be transferred to juvenile court.

June 25, 1999

This divorce suit is before the court again upon Ms. Sutton's presentation of a sketch decree that the court asked her to draft pursuant to the letter opinion of May 5, 1999.

This case has a lengthy history. A commissioner in chancery, to whom the case was referred in 1997, conducted evidentiary hearings in April of 1998 and filed a 29-page report. Arguments on both parties' exceptions to the report were heard on March 15, 1999. The court took matters under advisement. On May 5, 1999, the court sent out a letter opinion addressing all disputed issues in the case. Ms. Sutton was directed to prepare and circulate an appropriate final decree. When Mr. Marks declined to endorse the decree, Ms. Sutton gave notice that on June 21, 1999, she would present the decree. On June 17, 1999, Mr. Marks notified the court that he could not be present on June 21st because of a conflict in his schedule that predated receipt of Ms. Sutton's notice. In his letter, Mr. Marks said that "there are certain important issues … involving the retirement account and distribution of the house sale proceeds" that had not been "resolved." He asked the court to reserve ruling on equitable distribution.

On June 21st, Ms. Sutton appeared and tendered her sketch decree. Mr. Ratcliffe appeared and presented a paper entitled "Issues before the Court in regard to Decree of Divorce." Mr. Ratcliffe feels that additional hearings are necessary with regard to the several issues addressed in his paper.

When parties have presented their evidence and the court has rendered a final decision on all disputed issues in a case, the attorney who has been assigned the task of drafting the decree should do so promptly, and all other attorneys of record should endorse the decree (with appropriate exceptions noted) and tender it to the court for entry, so that the court's decision can be properly memorialized. No further hearings are necessary unless (1) non-

drafting counsel files an objection to entry of the order on grounds relating to its inaccuracy (i.e., it does not faithfully reflect the court's decision) or (2) a party has filed a motion for reconsideration of some specific issue and a hearing is granted on that motion.

In this case, no objections to the proposed decree have been filed alleging any inaccuracy, and no motion for reconsideration has been filed.

Thus, with respect to the matters raised in Mr. Mark's letter and Mr. Ratcliffe's paper presented on June 21st, the court finds as follows.

(1) The fact that certain information regarding the deferred compensation assets has not yet been ascertained is of no consequence. The proposed decree expressly provides for a subsequent QDRO, in which those matters would be appropriate addressed. Also see § 20-107.3(K)(4).

(2) The distribution of proceeds from sale of the marital residence has been decided, and the proposed decree accurately sets out the court's decision. Apparently, Mr. Ratcliffe now contends that the $10,000.00 allowed to him with regard to that asset should be augmented by an increase in value, or interest, or treated as a credit from Mrs. Ratcliffe's share of the net sale proceeds. He asserts that the land purchased by him has been treated as separate property.

Mr. Ratcliffe misreads the court's opinion letter. The court specifically found, as did the commissioner, that Mr. Ratcliffe's separate assets had been transmuted to marital property by commingling. The marital residence, which was jointly titled, was one of those transmuted assets. Thus, the principles applicable to the retraceable separate property portion of hybrid property, including the so-called *Brandenburg* formula (e.g., *Martin v. Martin*, 27 Va. App. 745 (1998); *Hart v. Hart*, 27 Va. App. 46 (1998)), are inapposite. Nevertheless, over Mrs. Ratcliffe's objection, the court did make a monetary award of $10,000.00 to Mr. Ratcliffe because of the contribution he made "in the acquisition and care and maintenance" of the marital residence. See § 20-107.3(2). The rationale for that award is explicitly set forth in the court's letter opinion.

To repeat, the monetary award to Mr. Ratcliffe is not premised on any finding that the land upon which the marital home was situated was Mr. Ratcliffe's separate property or that the marital residence was hybrid property. It was classified as marital property for the reasons explained in the opinion letter, and consideration was given to Mr. Ratcliffe in the distribution of marital assets by way of a monetary award, after the court weighed all of the statutory factors in § 20-107.3(E). Under these circumstances, Mr. Ratcliffe's latest assertion that the monetary award must reflect interest or a proportionate increase in value since the date of his contribution is incorrect. To increase his

24

monetary award would ignore the contributions that Mrs. Ratcliffe made to the "care and maintenance" of the asset and all the other factors in subsection E of § 20-107.3 that the court considered in making the equitable distribution.

(3) Mr. Ratcliffe also wants the court to revisit the issue of child support since the parties' oldest child has now graduated from high school. That matter is the appropriate subject of a modification. *This* decree should reflect the court's rulings as of May 5, 1999. If the court delayed the entry of a decree every time some intervening change allegedly occurred, it is possible that no decree would ever be entered.